**UNITED STATES of America, Plaintiff,**

v.

**$26,284.00 IN UNITED STATES CURRENCY, Defendant.**

**Civ. No. 89–73663.**

United States District Court,
E.D. Michigan, S.D.

Jan. 6, 1992.

Joyce F. Todd, Office of the U.S. Atty., Detroit, Mich., for plaintiff.

Scott E. Spencer, Toledo, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Agents of the United States Drug Enforcement Administration (DEA) seized the Defendant Twenty–Six Thousand Two Hundred and Eighty–Four dollars ($26,-284.00) following a contact initiated by the Agents with Claimant Thelbert Crossland at the Detroit Metropolitan Airport (Detroit Metro). The Plaintiff United States of America has filed this *in rem* forfeiture proceeding pursuant to Title 21 U.S.C. § 881(a)(6) to confiscate United States currency totalling $26,284.00. This opinion constitutes the findings of fact and conclusions of law of the court, after trial to the bench.

On May 15, 1989, Detroit DEA Task Force Agents Leslie Fountain and Randy Gilbert were referred a suggestion from the United States Customs Office in Los Angeles, California that one Tommy Brown, a Black male, would be departing at 4:05 p.m. that day from Detroit Metro on Southwest Airlines flight # 306 with a one-way ticket bought that morning bound for Ontario, California, a suburb of Los Angeles, carrying a large quantity of cash which was involved in the narcotics trade. As Ontario, California is a major drug trafficking area or "source city" in close proximity to the Mexican border, the Agents further investigated the matter. Upon checking the passenger manifest, they verified that a "Tommy Brown" was indeed scheduled to depart on Southwest Airlines flight # 306 to Ontario, California.

Shortly thereafter the Claimant in this case, Thelbert Crossland, arrived at Detroit Metro and proceeded to the ticket counter of Southwest Airlines. Crossland produced a one-way ticket on flight # 306 to Ontario, California, which had been purchased that same morning for passenger "Tommy Brown", and checked-in for the flight.

As Crossland advanced from the counter to the gate, Agents Fountain and Gilbert approached him because, they testified, he met the criteria of the California Customs Office. The Agents identified themselves and their purpose, and asked Crossland to identify himself, which he did. Crossland produced a California driver's license, issued under the name "Thelbert Crossland", and his airline ticket, which ticket had been

paid for in cash earlier that morning and issued under the name "Tommy Brown".

Crossland's only item of luggage was a hand-carried soft blue clothing bag which he voluntarily agreed the Agents could search. At this point, Agent Fountain informed Crossland that, although he could not take his baggage, he was at liberty to leave and was not under arrest.

Crossland did not leave, but accompanied the Agents to a security office where his bag was to be searched. Special Agent Riddle, already present in the room, asked Crossland where he came from prior to arriving at the airport. Crossland answered that he came from Toledo via taxi cab. Though he had arrived only minutes earlier, Crossland could not recall the amount of the taxi fare.

In the presence of Crossland, Agent Riddle positioned the bag on the floor and carefully unpacked it. The baggage contained a suit, tie and underwear, but no narcotics or cash. While Agent Riddle was bent over completing the search, he noticed a large bulge around the inside front of Crossland's sock in the ankle area, and informed him that it had become necessary to conduct a full body search as a result of this finding.

Agents Riddle and Gilbert placed Crossland in a police "pat down" position, began searching the ankle area, and discovered wads of currency bundled with rubber bands, inside Crossland's sock and taped to his leg. While they were retrieving this currency, Crossland requested that the Agents terminate the search, explaining that he would simply produce the currency himself. It was stuffed into his socks, around his waist, taped around his arms, and inside his shirt, all strategically placed to allow full movement of his body.

When asked, Crossland answered that he was unsure how much money he had. A subsequent count of the currency, however, revealed a total of $26,284.00, which was comprised primarily of small bills, i.e., bills under $100 in denomination, and was wrapped in $1,000 bundles, secured with rubber bands, and then placed around his body.

Crossland explained that he was carrying money which he had received from investors interested in his music production business in California. Agent Fountain explained to Crossland that he would call anyone necessary to verify that the money was in fact given for investment or other lawful purposes. However, Crossland refused to divulge any names or details. He merely stated that the money was for a music production venture.

When questioned as to why he was carrying the money in such an unusual fashion, Crossland responded that he was under the impression that it is unlawful to transport a large amount of currency through an airport and that the DEA might seize it. Crossland then mentioned a previous similar experience which he had undergone at Detroit Metro on January 8, 1988. At that time, he had been temporarily detained as he attempted to transport $10,000.00 in currency from Detroit to Ontario to deliver to his former boss, Mr. Roscoe. Although a trained canine had positively alerted to the presence of controlled substances on that money, he had eventually retrieved it from the Agents on that occasion, and was concealing this money to avoid another such experience.

Similarly, the Agents in the present case summoned a specially-trained canine named "Dingo" to the area. Dingo's qualified dog-handler, Agent Christen Dennard, an Investigator with the DEA Task Force, testified that Dingo was capable of determining whether a particular item had been exposed to or in contact with illicit drugs by its scent. Agent Dennard explained that Dingo would alert positively to the presence of a controlled substance by biting and gnawing at the item. Dingo, Agent Dennard testified, has maintained a perfect record ever since he was trained to detect. On every occasion his alert to an item has led to the discovery of controlled substances.

Initially, Dingo was given a broad sweep of the empty room before the currency was placed in the office. Agent Dennard then led Dingo from the room while the Agents hid the currency in a large trash can in the

room. When Agent Dennard and Dingo returned to the room and Dingo was released from his leash, he ran anxiously to the trash can, stuck his head in and grasped the bundles of currency, indicating that he had discerned the scent of narcotics on that currency.

At Crossland's request, Agent Dennard repeated the process. She ordered Dingo to sweep the area of the secretary's office. Then she and Dingo left, the Agents concealed the currency, and once again when Agent Dennard released Dingo, he ran to a cabinet of supplies and scratched at the door. The Agents opened the door, reached in and retrieved the currency. As a result of the positive canine alert, the Agents seized the currency and issued a receipt to Crossland.

The government instituted this forfeiture *in rem* action on December 20, 1989. Thelbert Crossland, the sole claimant in this action, filed a "claim of interest" to this property on January 8, 1990.

Title 21 U.S.C. § 881(a)(6) provides, in pertinent part, that:

> (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> > (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter....

These actions are to follow the procedural course as stated in 19 U.S.C. § 1615, as incorporated by 21 U.S.C. § 881(d), which provides, in pertinent part, that:

> In all suits or actions ... brought for the forfeiture of any vessel, vehicle, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant ... provided, that probable cause shall be first shown for the institution of such suit or action, to be judged of by the court....

■ Thus, this bifurcated trial commences with the burden of proof on the government. To secure forfeiture of property under this title, the Government must establish probable cause for belief that a substantial connection exists between the property to be forfeited and the suspected criminal activity. *United States v. $22,-287.00, United States Currency,* 709 F.2d 442, 447 (6th Cir.1983), *citing, United States v. $364,960.00 in U.S. Currency,* 661 F.2d 319, 323 (5th Cir.1981).

■ Once that threshold requirement is established, the burden of proof shifts to the Claimant to rebut the Government's evidence and show, by a preponderance of the evidence, that the money seized was not used to facilitate a narcotics transaction. If unrebutted, a showing of probable cause alone will support forfeiture. *United States v. Little Al,* 712 F.2d 133 (5th Cir.1983).

■ Courts have consistently held that in forfeiture proceedings "probable cause" is not a special term of art, but is the same standard employed to test searches and seizures generally. *United States v. One 1975 Mercedes 280S,* 590 F.2d 196, 199 (6th Cir.1978); *United States v. One 1975 Chevrolet K–5 Blazer,* 495 F.Supp. 737, 740 (W.D.Mich.1980). It is a reasonable ground for belief of guilt, supported by less than prima facie proof, but more than mere suspicion. *United States v. $364,960,* 661 F.2d 319, 323 (5th Cir.1981). Moreover, probable cause may be based wholly on circumstantial evidence which may include facts learned after the actual seizure of the property. *United States v. $41,305 in Currency,* 802 F.2d 1339, 1343 (11th Cir. 1986).

■ Plaintiff in the present case relied on the following in meeting its burden of establishing probable cause to believe the property in question was proceeds traceable to drug activity:

> (1) Agents Fountain and Gilbert had received a tip that morning that a Black

male named "Tommy Brown" would be travelling one-way to Ontario, California on Southwest Airlines flight # 306 with a large sum of money connected with the drug trade.

(2) Crossland, a Black male, was travelling on a one-way ticket purchased earlier the same morning of departure date to the "source city" of Ontario, California.

(3) Crossland, who checked no luggage and held only a small suit bag, was travelling with a ticket issued to "Tommy Brown", although his driver's license was in another name.

(4) Although Crossland's bag revealed no narcotics, a suspicious lump in plain view led to discovery of large sums of money strategically taped to his arms, legs and stomach area.

(5) A trained canine, "Dingo", had alerted positive twice to the presence of a narcotic scent on the money seized from Crossland.

(6) Crossland was unable to identify exactly how much money he was in possession of, or produce any information as to the identity of his "investors", and refused to call anyone to verify his story.

Consistent with the holding in *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), this circuit has applied a "totality of the circumstances" review to contacts made by law enforcement officials with citizens in an airport setting. Based on the foregoing, this Court found at the close of the Government's evidence in this case that the Government did have probable cause to seize the money from Crossland. Therefore, it is the Claimant, Crossland, who must show by a preponderance of the evidence that the property was not subject to forfeiture. *United States v. $22,287.00, United States Currency*, 709 F.2d 442, 446 (6th Cir.1983).

■ Crossland's testimony was that he is thirty-seven (37) years of age, and was born and raised in Toledo, Ohio. His employment was sporadic for several years, but for the two years prior to this incident he had been living in an apartment in Highland, California, a city approximately 25 miles from the Ontario Airport, and worked in Los Angeles. Crossland had gone to California to work in his cousin's production company, "New Directions Entertainment", which was located on Sunset Boulevard in Los Angeles. This company had engaged in the production of concerts and special events until the two owners separated and opened their own production companies. Crossland then had worked with his cousin's new company, "Toh-t'l Kun-trohl", as a project supervisor. This position entailed working on the set of all music video productions as a sort of general assistant.

Crossland testified that he was employed by Toh-t'l Kun-trohl earning approximately $200 per week from early 1988 through 1989 although he had not filed any federal income tax return for that period. He also acknowledged that he had frequently been delinquent in payment of his rent and utilities, several receipts for which were offered to support his argument that he resided in California and netted at least $200 per week.

Crossland further testified that in March, 1989, he had returned to Toledo to visit his mother for an indefinite period, and decided to organize an "Oldies But Goodies" concert in Toledo. Although he had never received a commitment from any entertainment group, nor ever contacted any entertainers about the possibility of performing, or decided upon a suitable venue or date, Crossland said that he had approached three potential investors whom he had known for many years for capital. They were Bill Talley, Claude Barnhill, and Cleo Syphs. According to Crossland, he had borrowed money from each of these men previously, although usually only in increments of $100 or less.

Crossland testified that after presenting his plans to the investors, he was able to borrow $5,000 from Talley, $3,000 from Barnhill, and $17,000 from Syphs. These loans were allegedly financed at a 10% interest rate, with the first payment due on January 1, 1990. Crossland testified that he accompanied Syphs to Syphs' attorney's office where the attorney gave him one promissory note which he and Syphs signed in that office. However, Syphs' testimony, discussed below, was that Crossland was

never present in the attorney's office. The attorney also allegedly, according to Crossland, gave Crossland a second promissory note, to take to Talley for signing. The third promissory note Crossland himself bought from a local drug store. Though Crossland could not produce the original promissory notes at trial, he did have a photocopy of each. His testimony was, in short, that the currency derived from legitimate business investments.

Crossland testified that the investors all had provided cash in small bills, apparently at different times and places, because that is the manner in which they do business. He then took the money and placed it in a shoe box in the basement of his mother's Toledo home, where he had stayed since returning from California, and left it there with no immediate plan for its future despite the January 1, 1990 due date on his loans.

Then, on the morning of May 15, 1989, Crossland said that he went to the dry cleaners and ran into an acquaintance named "Tommy Brown". Brown's whereabouts at the time of trial were unknown. Crossland could not recall where Brown or his family lived in Toledo or stayed in California. During a brief conversation, Brown mentioned that he was in possession of a ticket to California, leaving that same day, which he did not plan to use and would sell Crossland for $200. Although Crossland had no plans for leaving until then, he bought the ticket, went home, packed the money from the shoe box on his body, gathered a few articles of clothing, and left Toledo for Detroit Metro by taxicab.

Crossland testified that he carried cash because he does not "believe in" or trust banks. He did not carry the money in one place, e.g. in a bag, because he feared that the cash would be seized from him by the government if carried in that manner. Moreover, Crossland claims that "everyone" in his neighborhood conceals money in their socks, and everyone carries small bills and not large.

The putative holder of one of the promissory notes, Cleo Syphs, was Crossland's only corroborating witness at trial. The holders of the other two promissory notes did not testify. Syphs, a 74 year-old retired union official, testified that he owns apartment buildings from which he collects cash rentals. Though Syphs' wife is the manager of a bank, he keeps thousands of dollars in cash around his house because he distrusts banks and "I love to have and count money." He uses it for gambling, for making bond for friends, and to make loans, as necessary.

Syphs testified that he has known Crossland for years. In fact, Syphs and Crossland's parents had engaged in social activities together in the past. Syphs said he had not hesitated to loan Crossland the money, and said that he had encouraged Barnhill and Talley to invest as well. Syphs testified that when requesting the loan, Crossland had told him that the money was to be used to build a studio to make videos in Los Angeles. This testimony conflicts, of course, with Crossland's explanation that the money was to be used for promotion of a concert in Toledo. Moreover, in direct contradiction of Crossland's testimony, Syphs stated that he went alone to his attorney's office to have the promissory notes drawn up.

The original promissory note given to Syphs by Crossland was allegedly locked in Syphs' safety deposit box at the bank for safe keeping. Syphs testified that his wife was too busy to retrieve the document from the box for trial. The introduction of the *bank* in this regard is noteworthy, as he does not believe in keeping his *money* in a bank.

Syphs admitted that he had received notices of forfeiture of this currency, but claimed to have no interest in filing a claim for it because, he said, it was no longer his money; he had lent it to Crossland.

The Government maintains that the money seized from Crossland did not come from his allegedly legitimate business loans. The Court agrees. Claimant has failed in his attempt to assert a reasonable or credible explanation of the source of this cash and the preponderance of the evidence in the case, even excluding the hearsay matters relied upon by the agents for probable cause, militates to the conclusion that these funds must be forfeited.

The Court finds that Crossland's testimony as to the source of the currency is inherently incredible, as is that of Syphs. He would have the Court believe that his legitimate business involves concert promotion in Toledo, yet Crossland borrowed money from his alleged investors without having any plan as to the date of the concert, the forum, or the performers involved. Moreover, the one investor who testified said the money was lent to produce videos in California. Crossland supposedly earns income from this type of business, yet he has not filed a federal income tax return. The reason for taking the money to California also remains unanswered, if it was to produce concerts in Toledo. Also, it's indefinite term of relegation to a shoe box raises questions.

Crossland asserts that it was by pure coincidence that he came into contact with Brown at the dry cleaners, and that it was a coincidence that Brown happened to have a ticket to California which he had just purchased that morning to depart later the same afternoon; and Crossland decided to use that ticket to return to California under Brown's name and commence his business. Why had no trip been planned if his business plans required the trip?

Despite the fact that Agent Fountain offered to "call anywhere in the world" to verify the source of the currency, Crossland made no attempt to explain, other than in vague terms, that the money derived from investors. More importantly, Crossland testified at trial that he had the promissory notes from his three lenders with him at the airport at the time of the seizure, yet did not produce that documentation to prevent seizure of the currency. It appears to the Court that the notes were fabricated for purposes of trial.

The remote possibility that this money originated from legitimate ventures does not vitiate a strong probability, nor will it create a preponderance of evidence against a more reasonable conclusion. *United States v. $83,320 in United States Currency and $40 in Canadian Currency,* 682 F.2d 573 (6th Cir.1982). It may be concluded, reasonably, that these funds were either payment to Crossland for drugs which he had brought to Toledo and for which he had been awaiting payment there, or that he just had been sent as a courier to obtain drugs from California. The scent of narcotics on the cash, with the other peculiar circumstances of this case, confirms a finding that the funds had been used to facilitate the narcotics trade.

The totality of the facts here demonstrate by a preponderance of the evidence that the subject currency was used or intended to be used in transactions in controlled substances and that Claimant has not met his burden of proof of any legitimate source.

Accordingly, IT IS ORDERED AND ADJUDGED that the Defendant $26,284.00 in U.S. currency is hereby FORFEITED to the United States of America pursuant to 21 U.S.C. § 881(a)(6).

IT IS SO ORDERED.